UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 15 CR 515-4 |
| v. | |
| ANTHONY KHOSHABE | Judge John Z. Lee |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

Now comes the UNITED STATES OF AMERICA, by and through its attorney, ZACHARY T. FARDON, and respectfully submits the following Government's Response in Opposition to Defendant's Motion to Suppress Statements.

Defendant asks the Court to suppress as involuntary the entirety of his July 15, 2015, statement to the FBI. Defendant bases his motion almost entirely on one passing exchange between himself and one of the interviewing agents during a nearly two-hour, non-custodial interview, while ignoring numerous other aspects of the interview that undercut defendant's position. Defendant's motion identifies no other case in which the Seventh Circuit has upheld suppression under similar circumstances, and in fact the Seventh Circuit has consistently upheld the admission of statements in comparable cases. Defendant's motion must be denied.

## I.    BACKGROUND

### A.    The Indictment

On August 20, 2015, the grand jury returned a 14-count indictment charging defendant Anthony Khoshabe (hereinafter, "defendant") and co-defendants Albert

1

Rossini, Babajan Khoshabe, and Thomas Murphy with mail and wire fraud. Dkt. No. 1. The indictment alleges that defendants carried out a Ponzi scheme that defrauded investors of at least three million dollars beginning no later than September 2011 and continuing up until the date of the indictment. *Id*. at 2-7. The charged scheme involved defendants obtaining large payments from investors, ostensibly for the purchase of a variety of real estate-related investments that defendants had no actual right to sell or, where they did have such a right, on which they never delivered, and that defendants further made Ponzi-type payments to investors to convince them the scheme was legitimate and to induce further investments. *Id*. The primary vehicle for the fraud involved defendants selling investors bogus interests in mortgage notes held on distressed rent-generating properties. *See id*. at 3-5.

Specifically with respect to defendant Anthony Khoshabe, the indictment alleges that investors were falsely led to believe that defendant, through his company, Reliant Management, was working with Rossini and Babajan Khoshabe to manage the properties underlying the mortgage notes allegedly sold to investors and was collecting the rents from these buildings, which were in turn being paid to investors, minus a management fee. *Id*. at 1-3. The indictment further alleges that defendant, as owner and operator of Reliant Management, in fact performed no property management services and collected no rents, and the "rent" payments being paid to investors every month were derived from other investors' payments. *Id*. The indictment also alleges that the money investors paid to invest in the investment

program, rather than being used for investment purposes as promised, was instead paid out to defendant and his co-defendants for their own benefit. *Id.* at 6.

### B.     Defendant Anthony Khoshabe's Interviews with the FBI

During the course of investigating the investors' allegations in this case, FBI agents interviewed defendant twice. First, on September 14, 2014, agents met with defendant at his home. After agents identified themselves as law enforcement and explained they were investigating complaints about Albert Rossini's Devon Street investment program, defendant spoke with agents at length and answered numerous questions about his knowledge of, and involvement with, Rossini's investment program. During this first interview, defendant told agents that he worked for defendant Rossini for only approximately one month and that he had managed "a couple" of apartment buildings for Rossini, which involved collecting rents and paying expenses. Ex. A, at 1. Defendant further told agents that he himself invested approximately $10,000 to $20,000 with Rossini for mortgage notes and never received any of the promised payments or notes from Rossini. *Id.* at 2.

Agents interviewed defendant a second time on July 14, 2015. This second interview, which occurred in the lobby of defendant's condominium building, was audio-recorded. Defendant once again spoke with agents about his knowledge of, and involvement in, the Devon Street investment program. This interview lasted approximately one hour and forty-three minutes and covered numerous topics, including defendant's purported activities through Reliant Management as Rossini's

3

property manager for the properties involved in the investment program, defendant's purported compensation for these activities, the length of time defendant was involved with Rossini, the income defendant claimed on his tax returns related to Reliant Management, defendant's own purported investments with Rossini, defendant's awareness that the investment program was fraudulent, the source of funds defendant used to purchase his condominium, and defendant's receipt of hundreds of thousands of dollars of investors' money into his personal bank account. *See generally* Ex. B. And although defendant's motion correctly recounts that he at one point asked the agents whether he was "gonna get, like, in trouble or anything," *id.* at 4, defendant did not at any point ask for immunity or leniency or attempt to condition his participation in the conversation on his statements not being used against him. Nor did the agents at any point offer proffer protection, immunity, or any other form of leniency, which agents knew, based upon their training and experience, would need to be made in consultation with the U.S. Attorney's Office.

## II. ARGUMENT

### A. Defendant's July 14, 2015, Statement to Agents Was Voluntary

"An incriminating statement is voluntary if it is 'the product of rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.'" *United States v. Villalpando*, 588 F.3d 1124, 1128 -1129 (7th Cir. 2009) (quoting *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998). Further, law enforcement

officers conducting an interview of a suspect are under no obligation to reveal their motives or to otherwise act in the suspect's best interests in conduct the interview. *See United States v. Rutledge*, 900 F.2d 1127, 1130 (7th Cir. 1990) ("For from making the police a fiduciary of the suspect, the law permits the police to pressure and cajole, conceal material facts, and actively mislead[.]"). Although "a false promise of leniency may render a statement involuntary, police tactics short of the false promise are usually permissible." *Villalpando*, 588 F.3d at 1128. The critical question is "whether the government has made it impossible for the defendant to make a rational choice as to whether to confess." *Rutledge*, 900 F.2d at 1129. The court is to perform this analysis by reviewing the "totality of the circumstances." *Villalpando*, 588 F.3d at 1128.

Defendant contends that Agent Evans' passing response to defendant's generalized question about whether he was going to get in trouble amounted to a false promise that defendant's statements would not be used against him, and that Agent Evans' actions so far exceeded permissible bounds that it rendered defendant's statement legally involuntary and inadmissible. Defendant's argument, which is premised on a highly ambitious reading of a momentary rejoinder during a nearly two-hour long conversation, is unsupported in the law.[1]

---

[1] Although the caption of defendant's motion suggests he is seeking suppression of "statements," the only statement at issue is the one he gave to agents on July 14, 2015. The government does not understand the defense to be seeking suppression of the September 2014 statement.

1. **Agents did not promise defendant any form of immunity or leniency in exchange for his willingness to speak with them.**

First, Agent Evans' statement was not a promise at all. It was an ambiguous, passing response to a single question by defendant that was itself ambiguous. Contrary to defendant's suggestion, defendant did not ask about the effect of his *statements*. He broadly asked, "I'm not gonna get, like, in trouble or anything?" Ex. B, at 4. And contrary to defendant's claims, Agent Evans did not make any assurances that defendant's statements to the agents were somehow protected or that he we be immunized because he chose to speak to them. Far from being an unambiguous promise, Agent Evans' response to defendant was circuitous and confusing: "No, we're here again. I mean you know from earlier that a lot of folks have complained about investing with Bert [Rossini]." *Id.* Agent Evans then went on to say the FBI was investigating Rossini's investment program, in which defendant knew he had played a significant role. At this point, according to his own Affidavit, defendant was aware he could refuse to speak with agents and that his statements could be used against him. Nonetheless, defendant asked no further questions, sought no assurances, asked for no clarifications, or expressed any reluctance. There was no period of deliberation by defendant, and agents did not have to further cajole, encourage, or convince defendant to speak with them. Although Agent Evans did not expressly inform defendant that they were investigating defendant's criminal culpability, he was not required to. *Kontny*, 238

F.3d at 817 ("Nothing is more common in the noncustodial setting of police invesgigations for an undercover police officer to extract damaging admissions …. The admission is usable in evidence against the suspect even though he would never have spilled the beans to the officer had he known the officer's status.").

Moreover, the snippet of the interview on which defendant bases his entire motion occupies less than half of one page out of a 114-page transcript, *see* Ex. B, at 4, and the other 113 pages contain no other references to the idea of immunity, leniency, proffer protection, or any similar concept would that even arguably support defendant's argument. On the contrary, the remainder of the transcript discloses numerous exchanges or statements by the agents that are inconsistent with the idea that defendant had been given some form of immunity or promise of leniency. For example:

- Agent Evans expressly told defendant, "We can't say what happens out of this. … If something happened, it happened already. We can't turn back time but to the extent that you want to tell the truth and want to sit down and talk to someone and say look I might have made a mistake, you know, [what] can be done for me? … That is a, that is a conversation that could be had." Ex. B, at 111.

- Agent Evans expressly told defendant that he "didn't make those decisions" when asked whether another person was going to "get in trouble." *Id.* at 45.

- Agent Evans told defendant, "My preference would be if you say you're not involved is to sit down and understand it so that either we can prove or disprove." *Id.* at 96.

- Agents confronted defendant about his not actually performing any property management duties for the investors' properties, and defendant admitted taking money he knew was from a Ponzi scheme.

7

*Id.* at 83-90. Agent Evans then offered for defendant to meet with agents again to explain further with the benefit of bank records. *Id.* at 93. Defendant then asked whether he would need an attorney at that future meeting, demonstrating his awareness that he could potentially be facing criminal jeopardy. *Id.* Notably, Agent Evans' responded, "[t]hat's your right as an American. … I can't advise you of what's in your best interest." *Id.* at 94.

- On several occasions throughout the interview, all *after* defendant claims he had been promised he would not get in trouble, the agents repeatedly and expressly made clear they suspected he had participated in fraud and was now lying to them: ("I just don't think it's the truth. … I think you are [lying to me]. … You claimed over a half million dollars in income that you say you did not earn," *id.* at 72); ("You claimed almost a million dollars of income for doing nothing … That's not ethical. It's not right. It's wrong. … It's income from stolen money. … I'm telling you today I wouldn't be here wasting my time talking to you over nothing.," *id.* at 54); ("[I]t is against the law to give false statements to the FBI. … To lie," *id.* at 77); and ("We don't want you to place yourself in a position where you're now lying to the FBI and you're putting yourself and your future at risk," *id.* at 97).

In sum, a fulsome review of the transcript of the interview, which is required in order to evaluate the "totality of the circumstances," *Villalpando*, 585 F.3d at 1128, reveals that defendant has selectively focused on one brief exchange during a lengthy conversation, while ignoring the fact that the bulk of the interview undermines his claim that agents led him to believe he would not get in trouble as a consequence of speaking with them.

## 2. Defendant's argument is legally unsupported.

Even assuming *arguendo* that defendant, as he has claimed in his Affidavit, believed that Agent Evans had promised his statements would not be used against him, the law requires denial of defendant's motion. It is telling that defendant has

8

not cited – nor has the government found – any case in which the Seventh Circuit has found a non-custodial statement involuntary because of a false promise by the interviewing agent. In fact, as the Seventh Circuit has noted, "very few incriminating statements, custodial or otherwise, are held to be involuntary, though few are the product of a choice the interrogators left completely free." *Rutledge*, 900 F.2d at 1129.

In lieu of identifying comparable Seventh Circuit cases where the defendant's statement was actually held involuntary, defendant relies only on the Seventh Circuit's acknowledgement that, *hypothetically*, there may be situations in which agents' false promises could render a defendant's statement inadmissible. *See, e.g.*, *Sprosty v. Buchler*, 79 F.3d 635, 646 (7th Cir. 1996) ("Like other misrepresentations, an empty prosecutorial promise could prevent a suspect from making a rational choice[.]"). But the hypothetical situations imagined by the Seventh Circuit as potentially warranting suppression, bear little resemblance to the facts of this case. For example, in *United States v. Kontny*, 238 F.3d 815, 819 (7th Cir. 2001), the Court postulated that the defendant "might" have had a good ground for exclusion if "[the officer] had pretended to be a representative of the Mob and told [the defendants] that they would be killed if they didn't turn over their business records to him, or pretended to be an Assistant United States Attorney and assured them they would not be prosecuted if they cooperated with him[.]" Likewise, even in the very case defendant cites, *United States v. Rutledge*, the court postulated that a statement could be subject to suppression if "the government feeds the defendant false

9

information that seriously distorts his choice, by promising him that if he confesses, he will be set free, or if the government drugs him so that he cannot make a conscious choice at all[.]" 900 F.2d at 1129. Agent Evans's passing response to defendant's question about getting "in trouble" is a far cry from these sorts of extreme scenarios.

More instructive than these hypothetical fact patterns, are the actual cases in which the Seventh Circuit has found statements voluntary despite allegations of false promises by interrogating officers. First, in *Rutledge* itself, the defendant, who was in custody, had expressed concern about how his statements would be used and he was told his cooperation would help him, which turned out to be false, since his statements were ultimately used to greatly increase his sentence. *Id.* at 1128. The court noted that the agent's statement about cooperation being helpful "was not quite truthful" but was also "not quite a promise not to use anything [the defendant] said against him." *Id.* at 1130. The court went on to find the defendant's confession voluntary because the agent's statement did not make a rational decision impossible and because "it would wreak much havoc with prosecutorial prerogatives if casual inducements by police officers were treated as enforceable plea agreements." *Id.* at 1130-1132.

In *United States v. Villalpando*, 588 F.3d at 1126, the interrogating detective had convinced a reluctant defendant to speak to law enforcement by stating that the police were really interested in another person and that if defendant cooperated the detective would work with the prosecutor and the defendant's probation officer to

10

obtain leniency for the defendant. *Id.* Explaining that the court's task "is to examine whether [the defendant] was not able to make a rational decision due to promises made," the court found the defendant's statement voluntary, despite concluding that the detective had offered to keep defendant out of jail in exchange for his cooperation. *Id.* at 1128-1129. Noting that "the devil is in the details," the court reasoned that an examination of the detective's promises, including that the detective would "work this out" and, "we don't have to charge you[,]" revealed that "[n]one of these, standing alone or in the context of the interview, represented a solid officer of leniency in return solely for [the defendant's] admission[.]" *Id.* at 1129.

In *United States v. Montgomery*, 555 F.3d 623, 626-628 (7th Cir. 2009), an ATF agent had falsely assured the defendant, a felon who was in custody after being arrested with a firearm, that the most prison time the defendant could receive was ten years and that he was "not going to get ten years." After defendant was charged as an Armed Career Criminal, which subjected him to a 15-year mandatory minimum sentence, the defendant moved to suppress his statement on the ground that his statement was not voluntary because it was induced by a false promise of leniency. *Id.* at 628-629. Despite concluding that the agent's assurances to the defendant about his potential prison time were false, the court found the defendant's statements voluntary because the agent "did not promise [the defendant] that he would not receive a ten year sentence *if he confessed*; he said that [the defendant] would not receive ten years from the federal system." *Id.* at 629-630 (emphasis original). The

court further explained, "[t]he mere fact that [the agent] misstated the potential sentences in the federal system does not make the interrogation coercive …, especially when the purported sentence was not linked to [the defendant's] willingness to talk to the investigators." *Id.* at 630.

Broadly speaking, these cases makes clear that, for a defendant's statement to be held involuntary in this context, a law enforcement officer's purported promises of immunity or offers of leniency must be firm and unambiguous, as well as expressly tied to defendant's decision whether to speak to law enforcement. *See Villalpando*, 588 F.3d at 1129 (alleged promises "less than solid" and not made in return for admission); *Rutledge*, 900 F.2d at 1130 ("strong argument" for suppression "[i]f the officers, fully intending to use anything [the defendant] said against him, had said to him, 'Tell us all you know about the drug trade, and we promise you that nothing you tell us will be used against you[.]'"); *Montgomery*, 555 F.3d at 630 (misstated sentencing exposure was not sufficiently linked to defendant's willingness to talk to agent). The cases further make clear that the bar for finding involuntariness based on a claim of false promise is extremely high; the totality of the circumstances must reveal that it was impossible for the defendant to make a rational decision about speaking with law enforcement. *Villalpando*, 588 F.3d at 1128; *see also, Kontny*, 238 F.3d at 818 ("The circumstances did not remotely prevent [the defendants] from making a rational decision about whether to play ball with [the agent].").

12

These principles, as consistently annunciated by the Seventh Circuit, and as reflected in the absence of any cases supporting defendant's position, demand that the Court deny defendant's motion to suppress his statement to the FBI. The purported promise by Agent Evans was a far cry from a solid and deliberate assurance that if defendant continued to speak with agents, his statements would not be used against him. It was a passing, casual response to one question by defendant, and the entire exchange occupied a few seconds of a nearly two-hour conversation. Moreover, the totality of the circumstances – including the informal and non-custodial setting, the defendant's age and relative sophistication, his prior awareness that he did not have to speak to agents and that if he did so the statements could be used against him, and the numerous statements by agents that were inconsistent with defendant having some form of immunity – establish that defendant was not deprived of the ability to make a rational decision.[2]

---

[2] The non-precedential cases cited by defendant are inapt. In *United States v. Walton*, (10 F.3d 1027 (3rd Cir. 1993), one of the interviewing agents previously knew the defendant as the two had gone to high school together and the agent referenced his prior relationship with the defendant before inviting him to speak "off the cuff." Further, the Court noted that the setting of the meeting did not imply there was adversarial questioning, and there was no reason to believe that defendant suspected he was the subject of a criminal investigation. *Id.* The court further relied on its finding that "[i]n this case the agent went beyond a direct promise of leniency; he assured [the defendant] in advance that his statement would not be used against him." *Id.* at 1031. Here, by contrast, there was no prior relationship being exploited, the interview was at times notably adversarial, and the agents did not make an explicit assurance that defendant's statement would not be used against him.

Defendant's reliance on *United States v. Veilleux* is similarly misplaced. 846 F.Supp. 149 (D. N.H. March 15, 1994). In *Veilleux*, the interviewing sergeant explicitly told the defendant he had no intention of arresting him for possessing a gun and only wanted to locate it to ensure it was not found by a child. *Id.* at 151-152. The sergeant further had not *Mirandized* the defendant in spite of his being his custody, and the district court had

**B.      There Is No Other Basis in Law to Suppress Defendant's Statement**

As an alternative to arguing that his statement must be suppressed as involuntary, defendant asks the Court to suppress it "pursuant to the agents' promise." D. Mot. at 7. Citing only the general proposition that the government must be held to its agreements, defendant argues that the government should not be allowed to use defendant's statement because, according to defendant's view, Agent Evans promised that the statement would not be used against defendant. *Id.*

Defendant's argument stretches the facts beyond the breaking point and is entirely unsupported in the law. First, as discussed above, Agent Evans' passing statement during a short segment of a lengthy interview is not fairly characterized as a promise. *See Villalpando*, 588 F.3d at 1129 (officer's statements did not represent a "solid offer of leniency"). Second, the challenged statement was not tied to the use of defendant's statement – it related generally to whether defendant would "get in trouble." *See Montgomery*, 555 F.3d at 629-630 (agent "did not promise [the defendant] that he would not receive a ten year sentence *if he confessed*; he said that [the defendant] would not receive ten years from the federal system."). Third, the Seventh Circuit has made clear that a passing statement like Agent Evans's does not

---

expressly found that the sergeant did so intentionally, "affirmatively misleading him about the scope of his constitutional protection against self-incrimination." *Id.* at 155. Here, defendant was not in custody and was not expressly assured his statements would not be used against him.

bind the government. *See Rutledge*, 900 F.2d at 1130-1132 ("[I]t would wreak much havoc with prosecutorial prerogatives if casual inducements by police officers were treated as enforceable plea agreements."). Further, even if Agent Evans had intended to reach an agreement with defendant, he would not have had the authority to do so – which he as much as told defendant later on in the conversation. *See* Ex. A, at 45. There is no basis here to hold that the government is bound by an agreement not to seek to use defendant's statements against him.

### C. No Hearing Is Warranted

A hearing on a motion to suppress is only warranted where the defendant has put forth "definite, specific, detailed, and nonconjectural facts … that demonstrate that there is a disputed material issue of fact." *United States v. Rodriguez*, 69 F.3d 136, 141 (7th Cir. 1995) (citing *United States v. Woods*, 995 F.2d 713 (7th Cir. 1993)). Here, although defendant has presented specific and detailed facts, none of them are materially disputed. The relevant facts are all documented in the transcript of the recording and the defendant's Affidavit, and as demonstrated above, the law does not entitle defendant to relief on these facts. As such the Court should deny the defendant's request for a hearing on this motion.

15

## III. CONCLUSION

WHEREFORE, the government requests that the Court deny defendant's motion to suppress statements.

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

By:    *s/ Erik Hogstrom*
ERIK HOGSTROM
Assistant U.S. Attorney
WILLIAM NOVAK
Special Assistant U.S. Attorney
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(312) 353-8709

Dated: November 14, 2016

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was served on November 14, 2016, in accordance with Fed.R.Crim.P. 49, Fed.R.Civ.P. 5, L.R. 5.5, and the General Order on Electronic Case Filing ("ECF") pursuant to the district court's system as to ECF filers.

By:   *s/ Erik Hogstrom*
ERIK HOGSTROM
Assistant U.S. Attorney
WILLIAM NOVAK
Special Assistant U.S. Attorney
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(312) 697-4073

1