IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 15 CR 515-3 |
| ) | Judge John Z. Lee |
| ALBERT ROSSINI, *et al.* ) | |
| (ANTHONY KHOSHABE), ) | |
| ) | |
| Defendants. ) | |

**DEFENDANT ANTHONY KHOSHABE'S
REPLY REGARDING HIS MOTION TO SUPPRESS STATEMENTS**

Defendant, **ANTHONY KHOSHABE**, by and through his attorneys, **BREEN & PUGH** and **BLEGEN & GARVEY**, respectfully submits the following reply to the government's response (docket 191) to his motion to suppress statements (docket 181).

**I.   Defendant's July 14, 2015 Statements Should be Suppressed**

Defendant has claimed, and supported by affidavit and reference to the audio tape and transcript prepared by the government, that he was informed by the interviewing agents that his statements made on July 14, 2015, would not be used to against him. In its response, the government claims that Defendant's motion to suppress must be denied because: (1) the language used by Defendant and the agent was not sufficiently clear and/or did not involve sufficient words; (2) the totality of the circumstances demonstrate the statement was voluntary; and, (3) the law does not support Defendant's argument. The government's position is incorrect in all

three respects. Rather than acknowledging the clear language, albeit in layman's terms, the government instead seeks to require defendants and agents to use the language of lawyers during encounters on the street, to require a defendant to *repeatedly* ask whether his statements will be used against him, and to undermine the Seventh Circuit's direction regarding what forms of trickery agents may and may not employ during interviews.

### A. The language was sufficiently clear.

Although it goes entirely unmentioned in the government's response, Defendant's question regarding whether the interview was being recorded, and the agents' response, is critical. Because agents may use some types of deception during interrogations and interviews, it is not dispositive of the motion that the agents lied to Defendant. It does make clear, however, that agents had decided at the outset of the interview to engage in deception. In response to his inquiry, Defendant was first falsely told that he was not being recorded.[1] He then asks, "Wait, I'm not going to get like in trouble or anything?" and is told, "No we're here again. I mean you know from earlier that a lot of folks have complained about investing with Bert. *** So that's what we're investigating. *** We're just . . . on a fact finding mission."[2] It is

---

[1] Defendant's question "You guys aren't like recording this," is responded to by an agent with a laugh and "no." These statements do not appear on the government's transcript, but they are clearly audible on the recording, although easier to hear using headphones. The defense has provided to the Court, along with this filing, a CD containing the audio recording of Defendant's interview marked as Anthony Khoshabe Exhibit – Audio Recording. For the court's reference the discussion regarding whether Defendant's statements are being recorded occurs approximately two minute and 40 seconds (2:40) into the recording.

[2] Greater detail of this portion of the interview is set forth in Defendant's initial pleading, and the entire transcript is attached to the government's response.

2

apparent that the agent's denial of recording was false. This first false statement makes clear that the agents had decided to tactically employ falsity to obtain a statement from Defendant. It is also clear, the defense submits, that the agents extended this tactic to how they intended to make use of Defendant's words.

This first inquiry likewise makes the context of Defendant's following question crystal clear. Defendant wanted to know how his statements would be used; *i.e.*, if his words were going to be used against him. That is, after all, why he first asked if he was being recorded rather than arrested, charged, etc. The government's efforts to suggest that Defendant was not offered immunity or leniency with regard to *prosecution* (docket 191, pp. 4, 6,) should be rejected as beside the point. Defendant's first question makes clear that he was inquiring about whether his words would be used against him, not whether a prosecutor might one day seek to charge him based on information the government already possessed. If the latter were Defendant's inquiry, he would have asked whether he was "in trouble," not whether he was going to "get in trouble."[3]

Moreover, to the extent the government is suggesting that Defendant or the agents were required to use terms like "immunity" or "proffer," that contention should be rejected outright. "Defendant did not at any point ask for immunity." (docket 191, p. 4) "Nor did the agents at any point offer proffer protection,

---

[3] For this reason, cases cited by the government related to promises of leniency in prosecution or sentencing are inapplicable.

3

immunity, or any other form of leniency, which agents knew, based upon their training and experience, would need to be made in consultation with the U.S. Attorney's Office." *Id*. Few laymen understand immunity, and even fewer have ever heard of proffer protection. The fact that those specific, legal terms were not used in no way diminishes what Defendant asked of the agents and what he was told. *See, United States v. Lall*, 607 F.3d 1277, 1287 (11th Cir. 2010) ("Indeed, it is utterly unreasonable to expect any uncounseled layperson, especially someone in Lall's position, to so parse [the officer's] words. On the contrary, the only plausible interpretation of [the officer's] representations, semantic technicalities aside, was that the information Lall provided would not be used against him by [the officer] or anyone else."

In addition to criticizing Defendant's words, the government's response attempts to convince the Court that the agents' words were insufficient, arguing that the promise was a mere "snippet," a simple "passing" reference, and "circuitous and confusing" (Docket 191, pp. 7, 1, 5, 10, 13, 6). The transcript and audio-tape of the recorded conversation make clear that the agents' promise was clear, direct, and not muddled by what was said later in the conversation.

Most importantly, the word "no" is not equivocal. And, it is not made equivocal by further explanation as to why the answer is "no." In responding to Defendant's question, "Wait, I'm not going to get like in trouble or anything?" the response is "no," followed by this explanation, "we're here again. I mean you know

4

from earlier that a lot of folks have complained about investing with Bert. *** So that's what we're investigating. *** We're just . . . on a fact finding mission." The government claims this explanation is "circuitous and confusing" and that Defendant therefore should have asked follow up questions, sought additional assurances, expressed reluctance and/or taken time to deliberate. (docket 191, p. 6)

  Nothing about the agent's response is circuitous or confusing, and neither the statements themselves, nor Defendant's awareness that he could refuse to speak with agents, required further clarification. "No," is perfectly clear. The agent's follow up statements convey, also quite clearly, that they are investigating complaints against Bert (codefendant Bert Rossini) and that they are on a fact finding mission as opposed to a mission to gather evidence against Defendant.[4] Defendant has confirmed by affidavit that his understanding of the agent's answer was that Defendant's statements would not be used against him. In light of the context and plain language, that understanding is perfectly reasonable. *See*, *United States v. Stadfeld*, 689 F.3d 705, 710 (7th Cir. 2012) ("[a] defendant's perception that he is providing testimony under a grant of immunity does not make his statement involuntary, unless the perception was reasonable."), *quoting*, *United States v. Cahill*, 920 F.2d 421, 427 (7th Cir.1990).[5]

---

[4] There is nothing circuitous about the agent's answer. He simply refers back to a prior interview of Defendant during which Defendant also was told that a lot of people were complaining about investing with Bert.
[5] *Stadfeld* also makes clear that before a statement can be deemed involuntary, there must be some coercive conduct by government agents. Here, the false promise by agents that his statements will not be used against him is the sufficient coercive conduct.

Lastly, the government's suggestion that Defendant should have made further inquiries or asked follow up questions should be rejected. The government provides no indication regarding what follow-up questions it deems appropriate, or how many inquiries are necessary for its satisfaction. The reality is that Defendant received, in laymen's terms, a straightforward, unambiguous promise that his statements would not be used against him. No further follow-up was necessary.

### B. The totality of the circumstances warrant suppression.

Courts must, of course, look to the totality of the circumstances in determining whether a statement is voluntary. *Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir. 1997) (A confession is voluntary "if the totality of the circumstances demonstrates that it was the product of rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics calculated to overcome the defendant's free will.") Multiple courts have explained, however, that where an agent's deception involves a false statement as to the law, or involves a false promise as to how a defendant's statement is to be used, then that deception takes on particular import in the totality of the circumstances. In *Lall*, *supra*, the Tenth Circuit explained why the sort of false promises at issue here take on particular import, even under a totality of the circumstances analysis:

> While we look to the totality of the circumstances to determine the voluntariness of Lall's confession, a significant aspect of that inquiry here involves the effect of deception in obtaining a confession. We begin by observing that the deception at issue here did not involve a misrepresentation of fact. Such misrepresentations are not enough to render a suspect's ensuing confession involuntary, nor does it

6

undermine the waiver of the defendant's *Miranda* rights.

\*\*\*\*\*

Police misrepresentations of law, on the other hand, are much more likely to render a suspect's confession involuntary. *See, e.g., Henry v. Kernan*, 197 F.3d 1021, 1027–28 (9th Cir.1999) (police stated to suspect "what you say can't be used against you right now"); *see also Hopkins v. Cockrell*, 325 F.3d 579, 584–85 (5th Cir.2003) (officer assured suspect "that their conversation was confidential")

*Lall*, 607 F.3d at 1285. Likewise, in *United States v. Walton*, 10 F.3d 1024, 1027 (3d Cir. 1993), the Third Circuit explained that:

Again, the focus of our inquiry is on the totality of the circumstances, not solely on Montford's promise that Walton's statements would be "off the cuff." But this does not diminish the significance of the promise itself; given the uniquely influential nature of a promise from a law enforcement official not to use a suspect's inculpatory statement, such a promise may be the most significant factor in assessing the voluntariness of an accused's confession in light of the totality of the circumstances. *See Shears,* 762 F.2d at 401–4 ("[T]here are certain promises whose attraction renders a resulting confession involuntary if the promises are not kept, and the defendant's perception of what the government agents have promised is an important factor in determining voluntariness.").

*Walton*, 10 F.3d at 1027. Lastly, the Seventh Circuit has emphasized the distinctly coercive nature of false promises:

The reason we treat a false promise differently than other somewhat deceptive police tactics (such as cajoling and duplicity) is that a false promise has the unique potential to make a decision to speak irrational and the resulting confession unreliable. Police conduct that influences a rational person who is innocent to view a false confession as more beneficial than being honest is necessarily coercive, because of the way it realigns a suspect's incentives during interrogation. "An empty prosecutorial promise could prevent a suspect from making a rational choice by distorting the alternatives among which the person under interrogation is being asked to choose." *Id.* at 629 (quoting *Sprosty,* 79 F.3d at 646). The ultimate result of a coercive

7

interrogation is unreliable.

*United States v. Villalpando*, 588 F.3d 1124, 1128 (7th Cir. 2009)

In conjunction with the particularly coercive nature of the agent's false promise, the totality of the circumstances warrant suppression of the statement. As indicated in his affidavit, Defendant was not represented by an attorney during questioning, and he was not provided with *Miranda* warnings. Thus there was no statements from the agents, or anyone else, that undercut the promise that his statements would not be used against him.

The government also argues that the totality of statements within the recording undercut the agents' promise. "[T]he remainder of the transcript discloses numerous exchanges or statements by the agents that are inconsistent with the idea that defendant had been given some form of immunity or promise of leniency."[6] (docket 191, p. 7)   A review of the entire recording and transcript makes clear, however, that the opposite is true as on multiple occasions the agents made statements supporting that the promise to Defendant was made. For example:

- Agent Evans tells Defendant "what I'm hoping to get out of you is the truth and for you to help us out," indicating that the agents want Defendant's help; not to use his statements against him.   Tr. 42

- Agent Evans tells Defendant that it is against the law to lie to the FBI, indicating that Defendant's statements are not being used against him because, as the government has argued, the agents made clear they

---

[6] Again, the government confuses a promise that a statement will not be used with a promise not to prosecute, citing to instances in the transcript where agents indicated, although obliquely, that Defendant could be prosecuted. (docket 191, pp. 7-8) Because none of these references relate to the use of Defendant's words against him, none are applicable to this motion.

8

believed he was lying.  Tr. 83-84

- Agent Blau states, "You recently got married, you have, you know a strong career ahead of you. A good life ahead of you to mess up the rest of your life because of something Bert Rossini and as much as you love family even your dad may have been involved with it's just something it would be a shame," indicating that Defendant's statements will not be used against him and that the agents suspect he is covering for his father, not himself. Tr. 85

- The agents and Defendant discuss another meeting and whether Defendant should have a lawyer. Defendant states, "I'm putting my trust in you guys," indicating he has believed their assurances to him. Tr. 101

- Defendant requests to sit down and meet with the agents and investors, indicating that he understands his statements will not be used to prosecute him. Tr. 103

- Agent Evans raises the possibility of Defendant being a witness, suggesting that Defendant's statements will not be used to prosecute him. Tr. 103

- Agent Blau indicates that they do not want Defendant to learn information from his father and then repeat it to agents, resulting in perjuring yourself and "lies to the FBI" suggesting again that Defendant's statements (which the FBI already viewed as lies) would not be used against Defendant. Tr. 105

- Agent Blau indicates that if Defendant concocts a story with his father he "runs the risk of getting yourself in trouble," indicating that he is not currently in trouble. Tr. 106

- Agent Evans explains that Defendant can call to correct any statements that were not true and accurate and that "We don't want, you know, again this is, we're just here, it's not a trick bag we're just here for the truth." All of this indicates that Defendant's statements will not be used against him and that the agents have not "tricked" Defendant into incriminating himself. Tr. 121

The totality of the circumstances, including the entirety of the audio

9

recording and transcript support suppression of Defendant's statement.

### C. Case law supports suppression of Defendant's statement.

The government complains that Defendant has not cited a case factually on point from the Seventh Circuit, but instead relies on "hypothetical" warnings regarding what type of conduct agents must avoid. The government itself cites no case, however, indicating that its agents may ignore the Seventh Circuit's instructions. Nor, is it correct to say that because these circumstances have not yet been presented to the Seventh Circuit the motion must be denied. The facts of this case represent the very type of deception – the sort that goes to the heart of a defendant's decision to make a statement or not – that the Seventh Circuit has repeatedly cautioned, and other courts have found, would result in a statements suppression. *See*, *e.g.*, *Villalplondo*, 588 F.3d at 1129 ("To date, our cases dealing with this issue have generally imagined the hypothetical circumstance where a false promise would make a confession involuntary even as we found that such a circumstance did not exist in the case at issue. . . In these cases, we made clear that while a false promise of leniency may render a statement involuntary, police tactics short of the false promise are usually permissible. Trickery, deceit, even impersonation do not render a confession inadmissible ... unless government agents make threats or promises."); *United States v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2001) ( "We might have a more difficult case had Furnas gone further and promised the Kontnys they would not be prosecuted if they played ball with him, for that

10

conceivably is the kind of false promise that might induce a rational person to rely."); *United States v. Rutledge*, 900 F.2d 1127, 1130 (7th Cir. 1990) ("If the officers, fully intending to use anything Rutledge said against him, had said to him, 'Tell us all you know about the drug trade, and we promise you that nothing you tell us will be used against you,' then he would have a strong argument that any ensuing confession had been extracted by fraud and was involuntary."); *United States v. Walton,* 10 F.3d 1024, 1029-30 (3rd Cir. 1993) (promise that a defendant could make an "off the cuff" statement rendered it involuntary); *United States v. Veilleux*, 846 F.Supp. 149, 154-55 (D.N.H. 1994) (statement deemed involuntary because defendant was told it would not be used against him and he would not be charged). *United States v. Haak*, 2016 WL 6080556 (W.D. NY Oct. 18, 2016) (Detectives statements to defendant that "I'm not looking to mess with you; I'm not looking to come after you" and "you can either get on board, put on the team jersey, play for this team, or you can be on the losing team," was a promise not to prosecute sufficient to render the defendant's statement involuntary.)

In short, while the circumstances here are unusual, the Seventh Circuit has explained how they should be addressed. Once the Court concludes, as the defense submits it should, that Defendant was promised his statements would not be used against him, suppression should be the result.[7]

---

[7] *Rutledge*, *supra*, also explains that Defendant's statement can be suppressed on the basis that the government is held to its promises. *Rutledge*, 900 F.2d at 1130. The government's response that the language is insufficient fails for the reasons set forth above.

11

**II.     Because the Government Disputes that a Promise was Made, an Evidentiary Hearing is Warranted.**

The government argues that an evidentiary hearing is unnecessary because, "[h]ere, although defendant has presented specific and detailed facts, none of them are materially disputed. The relevant facts are all documented in the transcript of the recording and the defendant's Affidavit, and as demonstrated above, the law does not entitle defendant to relief on these facts." (docket 191, p. 15) It appears, however, that the government *is* disputing material facts; *e.g.*, the fact that Defendant was promised his statements would not be used against him. Defendant has averred that fact, and the audio recording and transcript support his position. The government has presented no affidavit from the agent (or agents) indicating that the agent did not mean what he said, or that there was some other confusion. If the government's position is that the agent's words have some meaning other than what was plainly said, then the agent should be required to testify and explain that other meaning.

If, on the other hand, the government's position is that a false promise was indeed made to Defendant that his statements would not be used against him, but Defendant is nevertheless not entitled to suppression under the law, then a hearing may not be necessary. The defense submits, however, that the law, in fact, supports suppression under those circumstances.

12

**III.     Conclusion**

       Defendant's statements of July 14, 2015, should be suppressed.

Dated: January 9, 2017

| | | |
|---|---|---|
| By: | /s/ Todd S. Pugh | /s/ Patrick W. Blegen |
| | Thomas M. Breen | Patrick W. Blegen |
| | Todd S. Pugh | Jodi L. Garvey |
| | Jonathan M. Brayman | Lisa L. Wood |
| | Robert W. Stanley | BLEGEN & GARVEY |
| | BREEN & PUGH | 53 W. Jackson Blvd. |
| | 53 W. Jackson Blvd. | Suite 1437 |
| | Suite 1215 | Chicago, IL 60604 |
| | Chicago, IL 60604 | (312) 957-0100 |
| | (312) 360-1001 | |