IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | |
| ) | 15 CR 515-3 |
| v. ) | |
| ) | Judge John Z. Lee |
| ) | |
| ANTHONY KHOSHABE, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Anthony Khoshabe ("Khoshabe"), along with Albert Rossini, Babajan Khoshabe, and Thomas Murphy (collectively, "Defendants"), have been indicted on multiple counts of mail and wire fraud. The charges against them arise out of a purported scheme whereby the Defendants are alleged to have fraudulently induced various individuals to invest in nonexistent real estate interests. Khoshabe has moved to suppress certain statements he made to FBI agents on July 14, 2015, arguing the statements were given involuntarily. Because the totality of the circumstances indicates that Khoshabe was induced to make these statements by a false promise not to prosecute, the motion to suppress [181] is granted.

## Background

During the course of investigating the conduct charged in this case, government agents interviewed Khoshabe on two different occasions. Def.'s Mot. Suppress 2, ECF No. 181. First, FBI Special Agent Jody Blau and Special Agent Michael Gorman of the United States Department of Housing and Urban Development, Office of Inspector General (HUD-OIG), interviewed Khoshabe at his home on September 10, 2014. *Id.*; *see* Govt.'s Resp. Opp. Mot.

1

Suppress, Ex. A, ECF No. 191. According to the report from this meeting, Khoshabe spoke with the agents about his prior work as a property manager for Rossini, investments he made through Rossini, and the recruitment of investors by Rossini and Babajan Khoshabe, Anthony's father. *See generally* Govt.'s Resp., Ex. A.

Then, on July 15, 2015, Special Agent Blau, along with Special Agent Lyle Evans and Task Force Officer Paul Martinez, interviewed Khoshabe again. *Id.*, Ex. B. Khoshabe states that he was "approached by agents . . . outside of the building in which he lived." Def.'s Mot. Suppress at 2. According to the Government, the second interview "occurred in the lobby of defendant's condominium building." Govt.'s Resp. at 3. The conversation lasted approximately one hour and forty-three minutes. *Id.*

Central to Khoshabe's present motion are two questions he asked the agents at the onset of the interview. At approximately two minutes and forty seconds into the interview, after answering some initial questions, Khoshabe stops in midsentence and asks the agents, "Are you guys like, recording this or something?" Def.'s Reply, Anthony Khoshabe Ex.—Audio Recording, at 2:40–2:45.[1] One of the agents laughs and reassures Khoshabe, "No." *Id.* Immediately thereafter, Khoshabe asks:

> Khoshabe: [W]ait I'm not gonna get like in trouble or anything?
>
> Evans: No, we're here again. I mean you know from earlier that a lot of folks have complained about investing with [Rossini].
>
> Khoshabe: Yeah.
>
> Evans: Yeah, so that's what we're investigating.

---

[1] This question and answer do not appear in the written transcript of the interview provided by the Government, but they are audible in the recording that Khoshabe provided with his reply. Of course, the Court is permitted to consider both the Government's written transcript and the audio recording regardless of their admissibility. *See* Fed. R. Evid. 104(a). And, in any event, the Government contends that there are no material facts in dispute for the purpose of this motion and do not contest that Khoshabe asked the question and was given the answer. Govt.'s Resp. at 15.

>Khoshabe: Okay, cool.
>
>Evans: We're just . . . on a fact[-]finding mission.
>
>Khoshabe: Okay cool.

Govt.'s Resp., Ex. B, at 4:29–5:4. After receiving this assurance, Khoshabe proceeds to discuss a number of matters with the agents relating to the charged scheme.

Khoshabe now requests that the Court suppress all statements he made to the FBI agents on July 15, 2015, after this exchange.[2]

## **Legal Standard**

Under the Due Process Clauses of the Fifth and Fourteenth Amendments, the Court may admit a confession only if the accused made it voluntarily. *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998)*; see Oregon v. Elstad*, 470 U.S. 298, 304 (1985). A confession is voluntary if "the confession is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *Dillon*, 150 F.3d at 757; *see also United States v. Stadfeld*, 689 F.3d 705, 709–10 (7th Cir. 2012). The government bears the burden to establish by a preponderance of the evidence that a confession was voluntary. *United States v. Carter*, 910 F.2d 1524, 1529 (7th Cir. 1990) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).

There is no bright line test to determine whether a confession was given voluntarily. Instead, the Court must consider the "totality of the circumstances," including such factors as the presence and extent of coercive activity, the nature and duration of questioning, and the defendant's "age, intelligence, education, and experience with the criminal justice system." *Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir. 1997).

---

[2] Khoshabe does not seek to suppress any statements made before this exchange nor presents any basis to do so.

Within this context, it has been said that "[t]rickery, deceit, even impersonation do not render a confession inadmissible," *United States v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2001), and "police are allowed to play on a suspect's ignorance, his anxieties, his fears, and his uncertainties," *United States v. Rutledge*, 900 F.2d 1127, 1130 (7th Cir. 1990). On the other hand, false promises by government agents can impede a defendant's ability to confess voluntarily. The Seventh Circuit has explained, "The reason we treat a false promise differently than other somewhat deceptive police tactics (such as cajoling and duplicity) is that a false promise had the unique potential to make a decision to speak irrational and the resulting confession unreliable." *United States v. Villalpando*, 588 F.3d 1124, 1128 (7th Cir. 2009). This is because a false promise can "destroy[] the information that [a defendant] require[s] for a rational choice." *Rutledge*, 900 F.2d at 1130.

This is not to say that all false promises by government agents are necessarily coercive. *See id.* at 1130–31 (finding statement that defendant's statements would "be helpful" to him was not coercive); *see also Villalpando*, 588 F.3d at 1129–30 (statements that detective would "go to bat" for defendant and "sit down" with the DEA to "work this out" were not coercive). But a promise by a government agent not to prosecute in exchange for a defendant's agreement to make additional statements can be sufficiently coercive to cross the line. *See United States v. Montgomery*, 555 F.3d 623, 630 (7th Cir. 2009) ("An empty prosecutorial promise could prevent a suspect from making a rational choice by distorting the alternatives among which the person under interrogation is being asked to choose."); *see also Kontny*, 238 F.3d at 818 ("We might have a more difficult case had Furnas gone further and promised the Kontnys they would not be prosecuted if they played ball with him, for that conceivably is the kind of false promise that might induce a rational person to rely."); *Rutledge*, 900 F.2d at 1129 ("If the officers, fully

intending to use anything Rutledge said against him, had said to him, 'Tell us all you know about the drug trade, and we promise you that nothing you tell us will be used against you,' then he would have a strong argument that any ensuing confession had been extracted by fraud and was involuntary.").

**Analysis**

Less than three minutes into what would be a nearly two hour interview, Khoshabe stopped his exchange with the FBI agents on July 14, 2015, and asked whether the conversation was being recorded. The agents responded with an unequivocal "no." Khoshabe immediately followed that up by asking if his statements would get him "in trouble." Again, the agents responded "no." The agents explained that they were there to investigate "a lot of folks [who] have complained about investing with [Rossini]."

Taken together, Khoshabe's actions to stop the conversation and ask these questions clearly indicate his concern that any statements to the FBI agents might be used against him in a subsequent prosecution. Khoshabe wanted to know if the agents were recording his statements precisely because he was concerned that his statements would be used against him later.[3] To make sure, Khoshabe asked the government agents point blank whether his statements would get him "in trouble." Only after he was assured that his statements would not get him in trouble and the agents were only investigating the complaints against Rossini did Khoshabe continue to speak with the agents. By promising Khoshabe that his statements would not get him in trouble in order to induce his continued cooperation, the conduct of the agents fits the mold of impermissible prosecutorial promises discussed by the Seventh Circuit in *Rutledge* and *Kontny*.

---

[3] *See* Khoshabe Affidavit ¶ 10, ECF No. 189. The Government does not dispute the accuracy or truthfulness of this statement.

Additional exchanges during the interview support the conclusion that Khoshabe's statements were made involuntarily. For example, several portions of the interview indicate Khoshabe's belief—frequently affirmed by the agents—that the agents were seeking information solely for the purpose of investigating the other Defendants. For example, shortly after Special Agent Evans's initial remark that the agents were on a "fact-finding mission," he repeated that this was their purpose. *Id.* at 14:18–19; *see also id.* at 101:5–8 (reassuring Khoshabe that the agents' inquiry "[was] not a trick bag" and that they were "just [there] for the truth"). During a discussion of Khoshabe's tax return, Evans suggested that claiming certain income might be "concerning."[4] After Khoshabe objected, Evans reassured Khoshabe by stating, "No, I'm good, I'm looking out for you." Govt.'s Resp., Ex. B, at 23:8–13. Furthermore, at one juncture, Khoshabe offered to wear a wire on behalf of the agents and speak with Rossini. *Id.* at 74:19–21. The agents declined his offer, *id.* at 74:24, but later suggested that Khoshabe might take the stand as a witness against the other Defendants. *See id.* at 96:1–20. The interview concluded with the parties discussing another time for Khoshabe to sit down with the agents to further discuss the conduct of the other Defendants. *See generally id.* at 93:22–100:15.

Not only did the agents persist in framing the conversation as an investigation of the other Defendants, they insisted that Khoshabe provide them truthful information, warning him that he might get in trouble if he did not. *Id.* at 77:8–37, 98:22–23. In one notable example, Agent Blau implored Khoshabe to tell the truth: "[Y]ou have . . . [a] good life ahead of you and to mess up the rest of your life because of something [Albert] Rossini[,] and as much as you love your family[], even your dad may have been involved with . . . it would be a shame." *Id.* at 79:10–14. Thus, Khoshabe was left with the belief that, while the other Defendants might be in

---

[4] The word "concerning" was noted as "IA" (presumably "inaudible") in the Government's transcript, but is plainly audible in the audio recording. Def.'s Reply, Audio Recording, at 16:26.

trouble, he could not get in trouble for his statements unless he lied. This left one rational course of action: talk to the agents and do so truthfully. Realigning Khoshabe's incentives in this way is precisely the result the Seventh Circuit warns against. *Villalpando*, 588 F.3d at 1128; *see also Dassey v. Dittmann*, No. 14-CV-1310, 2016 WL 4257386, at *34 (E.D. Wis. Aug. 12, 2016) (holding that statements should have been excluded where "[m]ore than merely assuring [the defendant] that he would *not* be punished if he admitted participating in the offenses, the investigators suggested to [the defendant] that he *would* be punished if he did not tell 'the truth'").

Two additional considerations bolster the conclusion that Khoshabe's statements should be excluded. First, the agents purposely arranged their meeting to occur in a non-adversarial setting, encouraging conversation. Govt.'s Resp., Ex. B, at 105:37–106:21 ("I know it's a very uncomfortable situation for the FBI to do this to you. I feel like this [] environment we've been in with the palm trees . . . is as laid back as it can get."). It is true that the non-custodial setting of the interview did not require *Miranda* warnings, and "good friend" tactics would not alone justify exclusion. *See Beckwith v. United States*, 425 U.S. 341, 342–43, 346–48 (1976). But the informal setting, in concert with the agents' assurances that the conversation was not being recorded and would not get Khoshabe in trouble and that they were investigating other individuals, distorted the options available to Khoshabe at the time of the interview.[5]

In response, the government points out that the admonishments by the Seventh Circuit in *Rutledge* and *Kontny* are only *dicta* and that the court has yet to actually find such prosecutorial

---

[5] Although Khoshabe wondered whether he should bring a lawyer the next time when the agents wanted to go through documents, it is clear that the Government's assurances were such that Khoshabe did not feel that he needed a lawyer during the July 14 interview. Govt.'s Resp., Ex. B, at 93:22–40. In response to Khoshabe's question, Agent Evans responded, "That's your right as an American." *Id.* at 94:5. This later statement by Agent Evans, however, hardly mitigates the coercive circumstances present throughout the remainder of the interview.

promises to be sufficiently coercive to merit suppression. This is correct. But other circuits have.

In *United States v. Walton*, the defendant was suspected of illegal firearms trafficking. 10 F.3d 1024, 1026 (3d Cir. 1993). After an initial inspection of his home—which the defendant was led to believe was purely regulatory—the defendant contacted a government agent, seeking to talk with him "off the record." *Id.* at 1027. The agent and defendant knew each other personally. *Id.* At an early point in the conversation, the agent told the defendant, "'I've known you for a long time. If you want, you can tell us what happened off the cuff.'" *Id.* When the government later charged the defendant based on his statements, the defendant moved to suppress them. *Id.* The Third Circuit concluded that the agent's statement, viewed within the totality of the circumstances, warranted exclusion. *Id.* at 1032. In so doing, the court concluded that (1) the agent's statement was fairly construed as assuring the defendant that his statements would not be used against him; (2) the prior investigation of the defendant's home gave him reason to believe he was not the focus of a more serious criminal investigation; (3) the parties' prior relationship and the public setting of the conversation blunted the adversarial nature of the conversation; and (4) the defendant had had limited exposure to the criminal justice system. *Id.* at 1030–31.

In *United States v. Lall*, a police detective investigating a home robbery suspected the defendant, who resided in the home, of a different crime. 607 F.3d 1277, 1281 (11th Cir. 2010). The detective asked to enter the defendant's bedroom to "'try to collect any evidence that might help'" and "'develop any leads to who might have committed the home invasion robbery.'" *Id.* The detective further assured the defendant and his family that any information the defendant shared with the police "would not be used to prosecute him." *Id.* The defendant was later

8

prosecuted based on statements he made to the detective, and the defendant sought to suppress them. *Id.* at 1282. The Eleventh Circuit held that the defendant's statements were coerced, relying almost entirely on the detective's explicit assurance that the defendant would not be prosecuted. *Id.* at 1287.[6]

The Court finds the rationale offered by these circuits to be persuasive. As in those cases, by promising Khoshabe that his statements would not get him in trouble and making other statements throughout the July 14 interview, the government prevented Khoshabe from obtaining the information that he needed to make a rational choice before agreeing to continue the interview. As a result, any statements by Khoshabe after the initial exchange lack the requisite voluntariness and must be suppressed. This is precisely the circumstances that the Seventh Circuit warned of in *Rutledge* and *Kontny*.

None of the remaining arguments advanced by the Government persuade the Court otherwise. First, the Government argues that the agents did not make an explicit promise of immunity or leniency, and at best offered an ambiguous response to Defendant's suggestion of whether he would get in trouble. Govt.'s Resp. at 4. This argument, however, parses Defendant's statements and the agents' answers too narrowly. No court has held that a defendant must explicitly request immunity or leniency in order for a promise to be found coercive. The Court does not read the Seventh Circuit's requirement of a "solid offer of leniency," *Villalpando*, 588 F.3d at 1129, to require lay defendants to speak in such terms. *Lall*, 607 F.3d at 1287 (reasoning that "it is utterly unreasonable to expect any uncounseled layperson" to adhere to

---

[6] The Fifth and Ninth Circuits have come to similar conclusions. *See Hopkins v. Cockrell*, 325 F.3d 579, 584 (5th Cir. 2003) (relying on law enforcement's statement to the defendant that "'[t]his [conversation] is for me and you. This is for me. Okay. This ain't for nobody else.'"); *Henry v. Kernan*, 197 F.3d 1021, 1027 (9th Cir. 1999) (focusing on a detective's statement to the defendant, "'Listen, what you tell us we can't use against you right now . . . . We'd just would like to know [sic].'").

"semantic technicalities" in communicating with law enforcement). Rather, it suffices that—as in this case—a reasonable person in the defendant's position would understand law enforcement to be offering not to use statements against the defendant or not to prosecute the defendant based on those statements.

The Government further contends that the agents' statement that Defendant would not get in trouble was a minor, "passing" exchange in the context of a nearly two-hour interview. Govt.'s Resp. at 7. This argument, however, ignores the fact that the exchange occurred at the beginning of the interview. Without the exchange, the rest of the interview would not have occurred.[7] And while the Government is correct to point out that the agents' false representations should not be viewed alone in determining voluntariness, they are of particular importance to the inquiry because they shaped Khoshabe's understanding of the entire conversation. *See Villalpando*, 588 F.3d at 1128; *Walton*, 10 F.3d at 1030. Additionally, the Government argues that, viewed as a whole, Khoshabe's conversation with the agents evinces voluntariness. Govt.'s Resp. at 7–8. As discussed above, however, the Court disagrees and finds that the totality of the circumstances only bolsters the conclusion that the agents' actions were coercive.[8]

---

[7] In its brief, the government quotes Khoshabe as asking, "I'm not gonna get like in trouble or anything?" Govt.'s Resp. at 6. But this is not correct. The entire question is: "Wait I'm not gonna get like in trouble or anything?" The "wait" is significant, because it indicates Khoshabe's reluctance to continue the interview unless he was assured that his statements would not be used against him later.

[8] The Government isolates a number of excerpts from the conversation that it believes demonstrate Khoshabe's statements were voluntary. *Id.* None of these excerpts, however, persuades the Court that the agents communicated to Khoshabe that his statements could be used against him and he could be prosecuted based on them. Additionally, each excerpt is consistent with the Court's observations of the conversation as stated above: namely, that the agents framed their task as learning about what Khoshabe knew about the other Defendants' activities, and told Khoshabe he could get in trouble only if he did not tell the truth in speaking with them.

## Conclusion

For the foregoing reasons, the Court grants Khoshabe's motion to suppress [181].

IT IS SO ORDERED.                    ENTERED:  2/28/17

*/s/ John Z. Lee*

**JOHN Z. LEE**
**United States District Judge**